STATE OF LOUISIANA
COURT OF APPEAL, THIRD CIRCUIT

12-271

KATHERINE SEPULVADO, ET AL.

VERSUS

REBECCA PROCELL, ET AL.

\*\*\*\*\*\*\*\*\*\*
APPEAL FROM THE
ELEVENTH JUDICIAL DISTRICT COURT
PARISH OF SABINE, NO. 62,798
HONORABLE STEPHEN BRUCE BEASLEY, DISTRICT JUDGE

\*\*\*\*\*\*\*\*\*\*

ULYSSES GENE THIBODEAUX
CHIEF JUDGE

\*\*\*\*\*\*\*\*\*\*

Court composed of Ulysses Gene Thibodeaux, Chief Judge, J. David Painter, and Shannon J. Gremillion, Judges.

**AFFIRMED.**

John Oliver Hayter, III
The Hayter Law Firm, LLC
9045 Ellerbe Road - Suite 103
Shreveport, LA 71106
Telephone:  (318) 698-3000
COUNSEL FOR:
    Defendants/Appellees - Rebecca Procell, et al.

Ted Warren Hoyt
Hoyt & Stanford, L.L.C.
315 S. College Road - Suite 165
Lafayette, LA 70503
Telephone:  (337) 234-1012
COUNSEL FOR:
    Plaintiffs/Appellants - Katherine Sepulvado, et al.

Charles David Soileau
Soileau & Garcie
730 San Antonio Avenue
Many, LA 71449
Telephone:  (318) 256-0076
COUNSEL FOR:
    Plaintiffs/Appellants - Katherine Sepulvado, et al.

**THIBODEAUX, Chief Judge.**

The plaintiffs appeal the trial court's granting of the defendants' peremptory exception of prescription, thereby dismissing the plaintiffs' claims of fraud and dismissing their petition to annul or reform the 1993 sale of their leasehold interest in land and mineral rights. Finding no manifest error in the judgment of the trial court, we affirm.

I.

## ISSUES

We must decide:

(1) whether the trial court manifestly erred in finding that prescription was not interrupted or suspended under the doctrine of *contra non valentem*; and

(2) whether the trial court manifestly erred in finding that no *relation of confidence* existed to excuse the plaintiffs' lack of diligence in failing to discover for seventeen years what they had agreed to sell.

II.

## FACTS AND PROCEDURAL HISTORY

In 1993, Gerald Procell approached Katherine Sepulvado about purchasing the leasehold interest in land that she owned with her sister, her aunt, and her two cousins. The land was in Sabine Parish next to a marina and bait business owned by Gerald Procell's father; it was overgrown, not being used, and Procell wanted to clean it up and use it for parking. A price of $10,000.00 was agreed upon, and Gerald Procell had an attorney draw up a three-page document, entitled Sale and Assignment (sometimes referred to as the deed), for the transfer of the property interest to himself and his wife Rebecca.[1]

---

[1]The record reveals that the plaintiffs' ancestors had sold 5.88 acres of land to the Sabine River Authority, then leased it back for 99 years for $417.60 (which was apparently 75% of the price

The sale was subsequently signed by Katherine E. Sepulvado, her sister, Virginia Ann Ebarb, their aunt, Nellie E. Leone, and Nellie's two daughters, Brenda Leone and Charlotte Leone Carlisle (referred to individually as Katherine, Virginia, Nellie, Brenda, and Charlotte, or referred to collectively as "the plaintiffs"). None of the plaintiffs dispute their signatures on page three of the document. Katherine and her sister, Virginia (now deceased), signed the document at Katherine's home in Noble, Louisiana, while Nellie, Brenda, and Charlotte signed at Charlotte's home in Shreveport.

The legal description of the property interest conveyed in the sale appears on page two. Part one (1) of the legal description details a 2.65-acre tract of land and a 3.23-acre tract of land lying along the cove as shown on the Toledo Bend Taking Line Maps. These two parcels comprise the 5.88 acres of land which is the undisputed lakeside property interest conveyed to Procell on both sides of his father's marina. Part two (2) of the legal description on page two conveys the mineral rights as follows (emphasis added):

> ANY AND ALL OIL, GAS AND OTHER MINERALS AND MINERAL RIGHTS THAT VENDORS AND ASSIGNORS MAY HAVE IN, TO, ON OR UNDER THE TWO TRACTS OF PROPERTY DESCRIBED IMMEDIATELY HEREINABOVE, *AND* ANY, AND ALL OIL, GAS AND OTHER MINERALS AND MINERAL RIGHTS, THAT VENDORS AND ASSIGNORS MAY HAVE IN, TO, ON OR UNDER THE EAST ONE-HALF (E ½) OF THE NORTHWEST QUARTER (NW ¼) AND THE WEST ONE HALF (W ½) OF THE NORTHEAST QUARTER (NE 1/4) OF SECTION TWO (2), TOWNSHIP SEVEN (7) NORTH, RANGE FOURTEEN (14) WEST, SABINE PARISH, LOUISIANA , LESS FIVE (5) ACRES IN A SQUARE IN THE SOUTHEAST CORNER OF THE SOUTHWEST QUARTER (SW ¼) OF THE NORTHEAST QUARTER (NE ¼).

---

paid by the river authority). Thus the plaintiffs' sale of their leasehold interest in the 5.88 acres constituted a profit of almost 24 times the amount that their ancestors paid in 1973.

A township is a six-mile square of land divided into thirty-six, one square-mile sections on a government survey; each section contains 640 acres, and a quarter-section contains 160 acres.[2] Hence, part two (2) of the Sale and Assignment signed by the plaintiffs included the conveyance of their mineral rights to the 5.88 acres of land, *and* their mineral rights to 155 additional acres which were covered by water in 1993. The Sale and Assignment was recorded in November 1993.

In September of 2009, an oil and gas land agent approached the plaintiffs about leasing the 155 acres, ostensibly due to the Haynesville natural gas shale formation under the land, but the agent then found the recorded sale to the Procells and so informed the plaintiffs. The plaintiffs assert that this was their first knowledge or discovery of the fact that they had transferred their mineral rights in the 155 acres to Gerald and Rebecca Procell.

In May of 2010, the plaintiffs filed a Petition for Rescission, Reformation, Fraud and Damages, asserting that they had agreed to convey only their interest in the 5.88 acres of lakeside property in the 1993 sale, and that Gerald Procell had fraudulently and intentionally included the oil, gas, and mineral rights to the 155 additional acres in the lake. Gerald Procell was deceased by that time, and the plaintiffs named Rebecca Procell and the Succession of Gerald Procell, along with eight other Procell heirs, as defendants in the petition.

In their petition, the plaintiffs alleged that their signatures "were obtained at different times, not in the presence of the notary, and not within the formalities required by Louisiana law for authentic acts, all with the intent and design of Defendants . . . to deceive Plaintiffs and conceal the fraudulently changed property description from them." They further alleged that they relied on Gerald Procell's assertions and representations as to the contents of the sale because a "relation of

---

[2]See definitions of "section of land" and "quarter section" in Black's Law Dictionary, Sixth Edition, West Publishing Co., 1990.

confidence" existed between them, due to their relationship as cousins, which prevented them from discovering the fraud.

Following a contradictory hearing in October 2011, the trial court granted the defendants' exception of prescription, finding that the plaintiffs could have easily discovered what was in the document if they had just read it, that they were aware of the facts surrounding the execution of the document, and that prescription began to run when the document was recorded on November 3, 1993. We affirm for the reasons fully set forth below.

## III.

## STANDARD OF REVIEW

> The plea of prescription must be specifically pleaded and may not be supplied by the court. Ordinarily, the exceptor bears the burden of proof at the trial of the peremptory exception. However, if prescription is evident on the face of the pleadings, the burden shifts to the plaintiff to show the action has not prescribed. If evidence is introduced at the hearing on the peremptory exception of prescription, the district court's findings of fact are reviewed under the manifest error-clearly wrong standard of review. If the findings are reasonable in light of the record reviewed in its entirety, an appellate court may not reverse even though convinced that had it been sitting as the trier of fact, it would have weighed the evidence differently.

*Carter v. Haygood*, 04-646, pp. 8-9 (La. 1/19/05), 892 So.2d 1261, 1267 (citations omitted).

## IV.

## LAW AND DISCUSSION

The plaintiffs contend that the trial court erred in granting the Procell defendants' exception of prescription. The plaintiffs argue that they were fraudulently induced to execute the sale of the mineral rights in 1993, and that their May 2010 petition to rescind the sale or have the deed reformed is not prescribed because they

did not discover the fraud until September 2009, when the leasing agent informed them.

The applicable law provides that prescription runs against all persons unless an exception is established by legislation. La.Civ.Code art. 3467. The doctrine of *contra non valentem* is an exception to the general rules of prescription; it applies in favor of a person who for some reason is unable to act. *Leach v. Alonso*, 95-325 (La.App. 3 Cir. 10/4/95), 663 So.2d 344, *writ denied*, 95-2662 (La. 1/26/96), 666 So.2d 671.

Consent to a sale may be vitiated by error, fraud, or duress. La.Civ.Code art. 1948. However, "[f]raud does not vitiate consent when the party against whom the fraud was directed could have ascertained the truth without difficulty, inconvenience, or special skill" unless "a relation of confidence has reasonably induced a party to rely on the other's assertions or representations." La.Civ.Code art. 1954. Fraud cannot be predicated on mere mistake or negligence, however gross. *Bass v. Coupel*, 93-1270 (La.App. 1 Cir. 6/23/95), 671 So.2d 344, *writ denied*, 95-3094 (La. 3/15/96), 669 So.2d 426.

In order to succeed on an action for fraud against a party to a contract, three elements must be proved: (1) a misrepresentation, suppression, or omission of true information; (2) the intent to obtain an unjust advantage or to cause damage or inconvenience to another; and (3) the error induced by a fraudulent act must relate to a circumstance substantially influencing the victim's consent to the contract. See La.Civ.Code art. 1953; *Curtis v. Blue Cross Blue Shield of Louisiana*, 07-782 (La.App. 3 Cir. 12/12/07), 971 So.2d 1249.

A claim of fraud is grounds for a relative nullity which is subject to liberative prescription of five years. La.Civ.Code art. 2032. An action to reform a deed is a personal action subject to a liberative prescription of ten years. *See*

5

La.Civ.Code art. 3499, and *Louisiana Oil Refining Corp. v. Gandy*, 168 La. 37, 121 So. 183 (La. 1929), *cert. denied*, 280 U.S. 516, 50 S.Ct. 65.

Here, the plaintiffs' petition was not filed until seventeen years after they signed the deed of sale, well beyond the five-year liberative prescription for fraud and well beyond the ten-year liberative prescription for reformation of a deed. Since their claims were prescribed on the face of the petition, it was plaintiffs' burden to show the trial court that their claims had not prescribed. *Carter*, 892 So.2d 1261.

*Contra Non Valentem*

The plaintiffs argued that prescription was suspended by the principal of *contra non valentem agere nulla currit praescriptio*, because they did not *discover* the fraud until September 2009 when the leasing agent informed them that they had transferred the mineral rights in 155 acres to Gerald Procell with the sale of the 5.88 acres of lease-back land in 1993. They cited *London Towne Condo. Homeowner's Ass'n v. London Towne Co.*, 06-401 (La. 10/17/06), 939 So.2d 1227, for the proposition that the date of recordation of the deed alone is not determinative of the date that prescription begins to run. This is true. However, both *London Towne* and the doctrine of *contra non valentem* provide that the relevant date for prescriptive purposes is the date that the obligee *learned or should have learned* of the act about which he complains.

Pursuant to the doctrine of *contra non valentem*, the discovery rule provides that prescription commences on the date the injured party discovers *or should have discovered* facts upon which his cause of action is based; hence, prescription does not accrue *as long as the plaintiff's prior ignorance is not willful, negligent or unreasonable*. *Wimberly v. Gatch*, 93-2361 (La. 4/11/94), 635 So.2d 206. The doctrine of *contra non valentem* is exceedingly stringent and applies only in "exceptional circumstances." La. C.C. art. 3467, Official Revision Comment (d). In

6

fact, the doctrine is traditionally applied in actions involving medical malpractice, long-latency diseases, progressive occupational diseases, and torts involving juveniles. *See Eastin v. Entergy Corporation*, 03-1030 (La. 2/6/04), 865 So.2d 49 (doctrine not applied in age discrimination case; proper focus was on the time of the discriminatory act, not the point at which the consequences of the act became painful).

Our courts have long held that "[t]his principle will not except the plaintiff's claim from the running of prescription if his ignorance is attributable to his own willfulness or neglect; that is, a plaintiff will be deemed to know what he could by reasonable diligence have learned." *Corsey v. State of Louisiana, Through the Department of Corrections*, 375 So.2d 1319, 1322 (La.1979). Under Louisiana law, the reasonableness of the plaintiff's action or inaction is a fundamental precept that the court must focus on in determining when prescription commences. *Tiger Bend, L.L.C. v. Temple-Inland, Inc.*, 98-424 (M.D. La. 6/15/99), 56 F.Supp.2d 686.

Here, the trial court recited the plaintiffs' complaints of fraud: they were given only the signature page of the deed; they did not read the contents of the deed; they did not sign in the presence of a notary; and, the deed failed to conform to the formalities of an authentic act under Louisiana law. The trial court found that the plaintiffs were aware of the facts about which they complained, that they knowingly and freely signed the signature page of the deed outside the presence of a notary without reading the deed, and without interest in reading it. The record supports the trial court's findings.

Based upon her own testimony, Katherine Sepulvado signed the signature page of the Sale and Assignment at Gerald Procell's store in Sabine Parish without asking to see the whole document, and she never asked for a copy of the document before or after it was recorded. Katherine then took the page home with her and had her sister Virginia come to her house to sign it. Katherine then took the page

7

to Shreveport and left it there for her Aunt Nellie and her cousins, Brenda and Charlotte, to sign.[3]

Katherine retrieved the signed signature page from Shreveport after a couple of days, brought it back home to Noble, and then dropped it off at the home of her mother and father-in-law, Theresa and Cleve Sepulvado, for their signatures as witnesses on the deed. Katherine retrieved the page again and returned it to Gerald Procell. Procell then gave it to Muriel Rivers to notarize. The plaintiffs and the notary admitted to signing the signature page outside the presence of each other, and all of them admitted to never asking to read, or see a copy of, the other two pages of the deed of sale.

These actions show that the plaintiffs were extremely negligent and lacking in any efforts to determine what they were selling. While Nellie and Brenda questioned Katherine in Shreveport about the other pages of the deed at the time of signing in 1993, they accepted Katherine's explanation that she only had the one page. They signed that page and never looked back, until 2010.

> Whatever is notice enough to excite attention and put the owner on his guard and call for inquiry is tantamount to knowledge or notice of every thing to which inquiry may lead and such information or knowledge as ought to reasonably put the owner on inquiry is sufficient to start the running of prescription.

*Cartwright v. Chrysler Corp.*, 255 La. 597, 604, 232 So.2d 285, 287 (La.1970).

Those who claim exemption from prescription by reason of ignorance resulting from fraud must allege and show that such ignorance was neither willful nor negligent. *Romero v. Trahan*, 345 So.2d 225 (La.App. 3 Cir.), *writ denied*, 347 So.2d 256 (La.1977). In *Romero*, we declined to apply the doctrine of *contra non valentem* nine years after a testament was presented for probate. There, the plaintiffs contended

---

[3] The record reflects that Nellie and her daughter Brenda were possibly in prison in Shreveport at or around the time of signing, as the deed was executed in 1993, and Brenda and Nellie were admittedly in prison for ten years and were released in November 2000, for an undisclosed crime following their employment with SARC (Sabine Association for Retarded Citizens) in Many, Louisiana.

that information as to the decedent's mental capacity was withheld from them. We disagreed, finding that the witness who came forward was available for the plaintiffs to question about the authenticity of the testament at the time of probate and at all times within the subsequent five years. In granting the defendant's exception of prescription, we stated that the plaintiff's failure to secure the witness's testimony was "indicative of his want of diligence in obtaining knowledge concerning the confection of the testament in question." *Id*. at 227-28.

Here, all of the plaintiffs were working women. They owned property and understood business. Nellie was in her late fifties and had a bachelor's degree from Northwestern; the three cousins were in the vicinity of forty. Brenda had a bachelor's degree in education and had begun work on a master's degree; Charlotte had an associate's degree and extensive business and management experience; and, Katherine graduated from a technical college and worked for AT&T for twenty-six years. Accordingly, the plaintiffs *should* have known of their cause of action to rescind the sale or reform the deed, which would have been easily determined by reading it before signing or at any time within the five or ten years after signing it. Here, prescription was not suspended under the doctrine of *contra non valentem.*

With regard to allegations of fraud, in a similar case where the plaintiff acknowledged his signature on a mineral deed, the second circuit held that the plaintiff's admission that he failed to read the deed before signing it negated his claim that he was defrauded. In *Martin v. JKD Investments, LLC*, 42,196 (La.App. 2 Cir. 6/20/07), 961 So.2d 575, quoting the first paragraph of La.Civ.Code art. 1954, the court articulated:

> [The plaintiff's] claim that he never read the mineral deed when he signed it negates the possibility of his being defrauded by defendants. *Fraud does not vitiate consent when the party against whom the fraud was directed could have ascertained the truth without difficulty, inconvenience, or special skill.* La. C.C. art. 1954. Clearly this is a situation in which the truth could have

9

> been ascertained without difficulty, inconvenience, or special skill since the document specifically stated that [the plaintiff] was conveying his mineral rights to [the defendant]. Thus, by showing that [the plaintiff] failed to ascertain what he was signing, when he could have easily read the document before signing it, defendants met their burden of proving the lack of factual support for fraud.

*Martin*, 961 So.2d at 578 (emphasis added). We agree with this analysis.

### *Relation of Confidence*

Here, however, the plaintiffs assert that they are not held to the duty of attempting to ascertain the truth pursuant to the first paragraph of La.Civ.Code art. 1954, because the second paragraph of that article states that the first paragraph is inapplicable where "*a relation of confidence has reasonably induced a party to rely on the other's assertions or representations.*" La.Civ.Code art. 1954 (emphasis added). The plaintiffs assert that such a relation of confidence existed between themselves and Procell that induced them to rely on his representations.

This relation of confidence was found to exist between an elderly mother and her son in *Sanders Family, LLC No. 1 v. Sanders*, 46,476 (La.App. 2 Cir. 12/14/11), 82 So.3d 434, *writ denied*, 12-414 (La. 4/9/12), 85 So.3d 702. There, the son allegedly induced his 76-year-old mother, who was the managing partner of the family-owned limited liability company (LLC), to sell certain parcels of LLC land to him and his wife for grossly inadequate amounts so that he and his wife could then re-sell the land at a huge profit to themselves. The appellate court found that the LLC had stated a cause of action for fraud under La.Civ.Code art. 1954 in three of four transactions because it showed that the mother trusted her son to help run the day-to-day operations of the LLC, and she sold property based upon his misrepresentations. The court characterized the action as a breach of confidence between a trusted party, or trustee, and his confidante.

10

Likewise, the relation of confidence was found to exist between an ill and aging silent partner who ultimately depended, to his detriment, on a couple's marketing and development skills due to the previous twenty-five years of lucrative business ventures together. *See Skannal v. Bamburg*, 44,820 (La.App. 2 Cir. 1/27/10), 33 So.3d 227.

Our own synthesis of the jurisprudence reveals that article 1954's relation of confidence has been found to exist where there is a long-standing and close relationship between the parties due to numerous transactions, as seen above in *Skannal* and *Sanders*. However, this confidante/trustee relationship is less likely to exist between parties to a single or limited business transaction.

For example, in *Nguyen v. Tran*, 01-1612 (La.App. 4 Cir. 2/19/03), 841 So.2d 62, where the defendant realtor misleadingly held herself out as the owner of a business during sales negotiations, the court held that the contract could not be rescinded on the ground of error or fraud because it found the plaintiffs guilty of inexcusable neglect in failing to undertake even the most rudimentary investigation of the defendant's assertions. No relationship of confidence existed; therefore, the plaintiffs had a duty to attempt to ascertain the truth, which they could have done easily, before agreeing to purchase the business.[4]

*See also Smith v. Frey*, 97-0987 (La.App. 4 Cir. 11/19/97), 703 So.2d 751 (the second paragraph of article 1954 was held inapplicable as there was no relation of confidence between the plaintiff and the insurer); *and see Garner v. Hoffman*, 93-0155 (La.App. 4 Cir. 5/23/94), 638 So.2d 324, *writ denied*, 94-2109 (La. 11/11/94), 644 So.2d 1068 (a plastic surgeon claiming that he was induced to purchase stock in a surgical facility by the deceitful acts of his associate failed to establish fraud as a ground for rescission; the fact that the surgeon considered his

---

[4]After holding that the contract could not be rescinded for error or fraud, however, the *Nguyen* court concluded that it could be rescinded on the basis of negligent misrepresentation. *Nguyen v. Tran*, 841 So.2d 62.

associate his mentor did not create a relation of confidence within the intendment of the civil code).

In *Homer Nat. Bank v. Nix*, 566 So.2d 1071 (La.App. 2 Cir.), *writ denied*, 569 So.2d 985 (La.1990), the vendor bank sold two lots for $8,500.00 each, believing them to be unimproved. The purchasers knew that both lots had houses on them. The bank learned that one lot was improved and sued to rescind the sale. After deposing the purchasers, the bank entered into a consent judgment rescinding the sale of the first lot, but dismissing its action to rescind the sale of the second lot. When the bank learned that the second lot also had a house on it, it tried to annul the consent judgment, claiming that a relation of confidence had induced it to rely on the misleading deposition testimony of the purchasers. The court disagreed, finding that the bank was already claiming fraud as to one lot, and it was unreasonable to rely on the opponents' representations without visiting the second lot before signing the consent judgment.

*See also Hawes v. Kilpatrick Funeral Homes, Inc.*, 39,089 (La.App. 2 Cir. 11/17/04), 887 So.2d 711 (found no relation of confidence under La.Civ.Code art. 1954 between a funeral home director and the daughters of the deceased).

The plaintiffs argue that Gerald Procell was a cousin, and they cite *George A. Broas Co. v. Hibernia Homestead & Sav. Ass'n*, 134 So.2d 356, (La.App. 4 Cir. 1961), to support their position that a transaction involving a relative should be considered suspicious. The referenced line from the case states: "Where a party has charged as fraudulent an action involving close relatives, either by marriage or blood, the courts have deemed the relationship, in itself, a highly suspicious circumstance." *Id*. at 361. The plaintiffs' reliance on this case is misplaced, as the relatives in *Broas* were not in an adversarial position with each other. Rather, there was collusion among them, and it was the defendant bank who successfully vitiated the contract between the relatives.

12

In *Broas*, Hibernia's president agreed to provide financing for his brother-in-law's development of a new subdivision in Algiers. The president's sister was vice-president of Hibernia and was married to the developer. She helped her brother hide her husband's loan application from the other members of the board of directors, such that it was never approved by the board of Hibernia. When a federal investigation resulted in the removal of the president and the rejection of continued financing for the development, the developer sued Hibernia for breach of contract and sought to have the financing commitment upheld. He argued that the president, his brother-in-law, was cloaked with apparent authority to act on Hibernia's behalf.

Hibernia argued that the contract was vitiated by the collusion of the president and vice-president, that it was never approved by Hibernia, and that the developer was fully aware of the lack of approval because of the intimate family relationships involved. The court agreed with Hibernia, and it was in this context that the court in *Broas* indicated, as we interpret the court to have meant, that the actions of close family members deserve scrutiny when there are allegations of fraudulent activity in an attempt to gain an unfair advantage, rather than an attempt to injure each other. We find that *Broas* is inapposite to the plaintiffs' position in this case.

Here, in any event, there were no close family ties or longstanding business relationships that would create the relationship of trust and confidence that the courts have found to excuse the duty of simply reading a three-page document before selling away one's rights in property. Gerald Procell was merely a distant cousin who entered into a single transaction with the plaintiffs. They barely knew him, and one plaintiff did not know him at all.

More specifically, Charlotte stated in her responses to interrogatories that Gerald was a relative and a well-known man in the community. However, she did not live in the community. Charlotte testified in her deposition that she had moved from Zwolle to Shreveport at age twenty-one, had been there almost forty years, did not

13

know Gerald Procell, had never talked to him, and did not know how or to what extent she was related to him. She further indicated that she would not recognize Gerald Procell if she saw him in person.

While Brenda had lived in Zwolle since 1981, she signed the document at her sister's house in Shreveport. Brenda gave sworn testimony in her answers to interrogatories that Gerald Procell was her third cousin and was a well-known man in the community, specifically stating, "We had discussed the terms of the transaction, and I trusted Gerald when he said that he would have the documents drawn up for us to sign." However, in her deposition, Brenda stated that she never discussed the document with him or interacted with him at all. She further admitted that she did not know where Gerald Procell lived, had never visited him, had never seen him at family reunions, did not know his children's names, did not attend his funeral, and did not know the cause of his death. This seems significant because Gerald Procell apparently suffered from diabetes, had his legs amputated, and died the year before the suit was brought, something a confidante would know about her trustee.

Nellie Leone is the mother of Charlotte and Brenda. Gerald Procell had been a second cousin to Nellie's husband, who was already deceased at the time of the 1993 transaction. Nellie had lived in Zwolle since the age of fifteen, but she signed the document at Charlotte's house in Shreveport. In her answers to interrogatories, Nellie also stated, "We had discussed the terms of the transaction, and I trusted Gerald when he said that he would have the documents drawn up for us to sign." However, in her deposition, Nellie admitted that she had seen Gerald Procell only one time in many, many years, and that they did not talk even then. She admitted that she did not know where he lived and that she had had no direct contact with him about the document or the transaction.

The record reveals that Katherine Sepulvado was the only plaintiff who had any contact with Procell about the sale. Her interaction with him was not as

family, but was limited to talking to him in his wife's convenience store, where she signed the document. She admitted that she did not ask to read the document, but readily signed the signature page and circulated it to the other plaintiffs and the witnesses for their signatures at different times and locations, before returning it to Procell, who then took it to a notary. The trial court stated that:

> Plaintiffs would need more than merely pointing to correlates on a family tree, especially one as distant (and contested) as six to eight degrees, or a co-plaintiff's belief that her relative was "an upstanding guy" to establish such a relationship for the sake of escaping the La.Civ.Code art. 1954 exception. Therefore, this court finds no relation of confidence based on the showing made.

We find no manifest error in the trial court's finding that no relation of confidence existed between the parties under La.Civ.Code art. 1954 that exempted them from their duty to read the document either at the time of signing, or at some time within the respective prescriptive periods, of five and ten years, for rescinding or reforming the sale.

Finally, while we need not discuss the merits of fraud, we note that there was no evidence that Gerald Procell knew in 1993, or even at the time of his death, that the land in the lake had any value outside fishing. In *Winegeart v. Texas Industries, Inc.*, 390 So.2d 265 (La.App. 3 Cir. 1980), *writ denied*, 396 So.2d 886 (La.1981), we held that the vendor could not rescind his sale on grounds that the purchaser fraudulently misrepresented the value of the land, where the purchaser had no special knowledge as to the value of gravel deposits there, and the vendor presented no evidence that $1,200 per acre was not a fair purchase price. Here, the plaintiffs admitted that they did not even have the land appraised.

V.

## **<u>CONCLUSION</u>**

Based upon the foregoing, we affirm the trial court's judgment granting the defendants' exception of prescription.

All costs are assessed against the plaintiffs.

**AFFIRMED**.